# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6496 | **DATE** | 1/16/2002 |
| **CASE TITLE** | Patrick Floress vs. Larry Massanari | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Memorandum Opinion and Order entered. Plaintiff's Motion for Summary Judgment [#13] is hereby granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| ✓ | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices: 2

**JAN 1 7 2002**
date docketed

docketing deputy initials

1/16/2002
date mailed notice

courtroom deputy's initials FT/*secy*

FILED-ED3

02 JAN 16 PM 3: 20

Date/time received in central Clerk's Office

CLERK
U.S. DISTRICT COURT

mailing deputy initials FT/*secy*

Document Number

19

PATRICK FLORESS          )
                         )      No. 00 C 6496
          Plaintiff,     )
                         )      Arlander Keys
     v.                  )      Magistrate Judge
                         )
LARRY MASSANARI, ACTING  )
COMMISSIONER OF SOCIAL   )
SECURITY,                )
                         )
          Defendant,     )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Patrick Floress, moves this Court for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure. Plaintiff moves the Court to affirm the Commissioner's decision finding him disabled, but to reverse the Commissioner's decision that Plaintiff was not disabled prior to March 8, 1999. For the reasons set forth below, Plaintiff's Motion for Summary Judgment is Granted.

## PROCEDURAL HISTORY

Plaintiff applied for disability insurance benefits ("DIB") and supplement security income ("SSI") on May 18, 1998, alleging a disability onset date of March 25, 1998. (R. at 47-49, 388-391.) However, Plaintiff amended the onset date to September 9, 1998, which was the last date he was employed. (R. at 96, 99.)

Plaintiff's claims for DBI and SSI were denied initially and on reconsideration. (R. at 28-31, 34-36.)

Plaintiff requested and received a hearing before Administrative Law Judge Leo L. McCormick ("the ALJ") on March 5, 1999. (R. at 32.) Following the hearing, the ALJ issued a partially favorable decision, finding Plaintiff disabled as of March 8, 1999 and thereafter, but not prior to that date. (R. at 24). On November 18, 1999, Plaintiff filed a Request for Review of Hearing, seeking a review of the ALJ's determination that he was not disabled between September 9, 1998, the onset date Plaintiff alleged in his application, and March 8, 1999, the onset date established by the ALJ. (R. at 11.) On August 23, 2000, the Appeals Council denied Plaintiff's Request for Review, and the ALJ's decision stands as the final decision of the Commissioner. (R. at 7.)

## STATEMENT OF FACT

### A. EVIDENCE PRESENTED AT PLAINTIFF'S HEARING

#### 1. Plaintiff's Testimony

At the hearing, Plaintiff testified that he was born on February 11, 1954, and had completed three years of college. (R. at 410.) Plaintiff resides in an apartment in McHenry, Illinois, with his wife of 20 years, his three daughters, and one grandson. (R. at 411.) Plaintiff worked as a restaurant manager for 13

years, until pain and related physical impairments forced him to quit in March of 1998. (R. at 57.) Plaintiff filed his initial application for DIB and SSI on May 18, 1998, alleging an onset date of March 25, 1998.

Plaintiff subsequently took a job as a chef at Host-A-Roast Pig Roast & Catering Company. (R. at 96, 97, 99.) Plaintiff claims that he accepted this position, despite his ailments, because he needed the income to support his family and it was less demanding than his previous job. (Id.) Nevertheless, Plaintiff's impairments forced him to resign from Host-A-Roast on September 8, 1998. (Id.) Plaintiff amended his application to reflect a new onset date of September 8, 1998. (R. 409.) Plaintiff testified that he has not worked since September 8, 1998. (R. at 411.) Plaintiff's only source of income is a Navy disability check for $388.00 per month. (Id.)

Plaintiff described his various impairments to the ALJ. Plaintiff has Belles Palsy and wears a hearing aid in his left ear. Although the hearing aid helps, Plaintiff still has difficulty hearing. (Id.) Plaintiff was prescribed the use of a cane to steady him while standing and walking. (R. at 419.) Plaintiff has pain in "all the joints," including his hips, knees, ankles, lower back, and hands. (Id.) Plaintiff describes the pain in his hips and knees as "aching." (R. at 419, 420.) He

drives only short distances, and only once or twice a week. (Id.) Aching pain in his legs, knees, and back prevents Plaintiff from walking more than a block without stopping. (R. at 421.) Plaintiff reported that he could stand for about 15 to 20 minutes, before his back, hips, knees, and ankles begin to ache. (Id.) If he sits for more than one hour, he experiences aching pain in his lower back, hips, and knees. (R. at 422.) Plaintiff uses his cane and chair arms to assist him in standing from a seated position. (Id.)

He takes arthritis medication to relieve pain caused by sitting for long periods of time. (Id.) He takes Sorbrex for pain, as well as water pills and Elavil, a nerve pill that allows him to sleep at night. (R. at 423, 426.) Prior to March of 1999, Plaintiff was taking Arthertex 50 for pain, and before that, he was taking 800 milligrams of Motrin, which did not relieve his pain. (R. at 424.) Plaintiff also takes Atenonol and Lasix for his heart condition, Prilosec for gastro-esophageal reflux disorder, Allopurinol for kidney stones, and Celebrex for arthritis pain. (R. at 370.) He has been on Naprosyn, Darvocet, Tylenol with codeine, and Arthrotec, but says none has helped relieve his pain. (Id.)

Plaintiff also complained of severe aching pain in his knuckles and fingers on both hands, similar to that in his hips

4

and knees. (R. 429.) He testified that the pain in his hands limits his daily activities, preventing him from tying his shoes and making models. (Id.)

In early 1998, Plaintiff began complaining to his physicians that he was suffering from syncopal episodes, which were triggered by hard coughing and laughing. During an episode, Plaintiff would lose muscle control and fall to the ground. In February 1999, one of Plaintiff's doctors decided to track Plaintiff's episodes by attaching a heart monitor to Plaintiff for a thirty-day period. (R. at 414.) Plaintiff called the hospital every time he suffered an attack; in one month, he called the hospital approximately 30 times. (R. at 416.)

Plaintiff stated that the episodes were occurring with increasing frequency and that he had experienced numerous episodes of dizziness and falling. (R. at 433.) The episodes typically lasted a few minutes, although he testified that one lasted for a half an hour. (Id.) Plaintiff testified that he was awake during the episodes, which left him feeling weak, tired, and listless for about a half an hour. (R. at 434.)

### 2. Medical Evidence

Plaintiff contends that he suffers from several medical conditions, including arthritis in the hips, knees, hands, and lumbar spine (R. at 261-262, 320, 322.), severe obstructive sleep

apnea syndrome (R. at 263.), cataplexy with narcolepsy (R. at 373.), cardiac impairment (R. at 245, 309.), fibromyalgia, bursitis of the wrists, edema of the ankles, obesity (R. at 379.), gastro-intestinal reflux disease (R. at 305.), and partial hearing loss in the left ear. (R. at 320.) Since January of 1998, Plaintiff has been under the continuous care of a team of doctors, including his primary physicians, two orthopedists, a neurologist, a cardiologist, and a rheumatologist.

- **Dr. Arun Narang, M.D. and Dr. Sunita Narang, M.D. - Primary Treating Physicians**

On January 9, 1998, Plaintiff began regularly seeing his primary physicians for complaints of blackouts, fatigue, and dizziness. (R. 160.) Following a syncopal episode in January of 1998, Plaintiff underwent an MR of the brain. (R. 190.) The MR revealed that the ventricular system and other CSF spaces were normal for Plaintiff's age. (Id.) The test indicated that the cerebrum, cerebellum, and brainstem exhibited normal imaging characteristics without focal lesions. (Id.) Alteration of signal in the left mastoid air cells was revealed and determined to be likely the result of chronic or possibly acute inflammatory changes in this structure. (Id.)

Dr. Narang's office notes revealed that Plaintiff had another syncopal episode on March 2, 1998, which occurred as a

6

result of Plaintiff laughing loudly. (R. 163.) Dr. Narang prescribed a heart monitor for Plaintiff after he experienced more fainting spells, and Plaintiff participated in an arrhythmia surveillance and transtelephonic monitoring program. (R. at 134.) Plaintiff's condition was monitored from March 13, 1998 through April 14, 1998, and again in February 1999. (R. at 384-385.) While being monitored, Plaintiff experienced episodes of passing out, dizziness, chest discomfort, weakness, shortness of breath, head pressure, palpitations, and lightheadedness. (Id.)

On June 16, 1998, Dr. Narang diagnosed ventricular arrhythmia, noting that Plaintiff's syncopal episodes were non-cardiac in nature. (R. at 238.) The doctor indicated that, in addition to experiencing dizziness, shakiness, and nervousness, Plaintiff has reactive hypoglycemia, as well as arthritic knees and hips. (R. at 241-242.) Dr. Narang opined that Plaintiff's ability to do work-related activities was limited with respect to standing, moving about, lifting, carrying and handling objects, and traveling. (R. at 242.) The medical records indicated that Plaintiff's "[d]isability is due to arthritis of hips and knees." (Id.) Office notes from May 4, 1998 and July 2, 1998 document Plaintiff's continuing syncopal episodes, his symptoms of shakiness and dizziness, and a diagnosis of obstructive sleep apnea syndrome. (R. at 165-167.)

**Dr. Warren S. Jablonsky - Treating Orthopedist**

Dr. Jablonsky saw Plaintiff on January 21, 1998, for a follow-up evaluation of his left hip pain. (R. at 185.) Plaintiff reported that the Daypro samples provided by Dr. Narang did not relieve the pain from his arthritis. (Id.) Plaintiff explained that he had decreased his hours of work to 12-13 hours a day, but that he was still on his feet during the workday. (Id.) Plaintiff complained of a significant amount of pain in his hip, as previously described. (Id.) Dr. Jablonsky reported that Plaintiff's exam was essentially unchanged. (Id.) The doctor recommended seated work for Plaintiff, with occasional standing and walking, and no climbing for four weeks after the visit. (Id.) Dr. Jablonsky provided Plaintiff with Naprelan for pain relief and detailed the risks and benefits of proceeding with a total hip arthroplasty at such a young age. (Id.)

On February 11, 1998, Plaintiff met with Dr. Jablonsky again and advised him that the Naprelan had given him some relief from his pain. (R. at 187.) However, Plaintiff continued to complain of pain with lengthy standing or ambulation. (Id.) His examination revealed no significant palpable tenderness in the lateral aspect of the hip. However, Plaintiff did suffer pain with range of motion, primarily internal and external rotation. (Id.) Dr. Jablonsky again discussed the possibility of

8

proceeding with total hip arthroplasty and a rehabilitation
program. (Id.) Plaintiff decided to hold off, and Dr. Jablonsky
recommended the use of a cane and prescribed Naprelan or Naprosyn
for a month. (Id.)

On March 20, 1998, Plaintiff visited Dr. Jablonsky for a
follow-up and complained of recent pain in his left hip. (R. at
225.) Plaintiff also told Dr. Jablonsky that he had some right
lower extremity pain, secondary to a previous L5-S1 herniation
that had been treated by Dr. Parikh. (Id.) Plaintiff stated that
his hip pain remained unchanged, and that his back pain had been
aggravating his hip pain, and vice versa. (Id.) Dr. Jablonsky
again explained the benefits and risks of a total hip
arthroplasty, and Plaintiff agreed to consider it further. (Id.)

On June 4, 1998, Dr. Jablonsky diagnosed Plaintiff with
degenerative joint disease of the left hip. (R. at 261.) He
indicated structure changes, including anatomical deformity, bone
destruction, and bone hypertrophy, with decreased joint space and
osteophytes. (Id.) Dr. Jablonsky noted loss of joint motion in
the hip with flexion of 100 degrees. (R. at 262.) He noted that
Plaintiff uses a cane for assistance in weight bearing, and again
indicated total hip arthroplasty as the recommended procedure.
(Id.) The doctor opined that Plaintiff should do primarily
seated work, with only occasional standing. (Id.)

### · **Dr. Mahesh N. Parikh, M.D. - Treating Neurologist**

In January of 1998, Plaintiff began seeing Dr. Parikh, a neurologist, for his excessive sleepiness, as well as back pain. (R. at 373.)  On April 20, 1998, Dr. Parikh diagnosed Plaintiff with severe obstructive sleep apnea syndrome and prescribed a CPAP breathing machine to help him sleep.  (R. at 263.)

On August 16, 1998, Plaintiff went to Northern Illinois Medical Center's emergency room, complaining of back pain.  (R. at 337.)  He explained that the increasing back pain started while he was lifting a pan of food at work.  (Id.)  Plaintiff also complained that his left leg was slightly weak, and that he experienced a pain radiating down the posterior thigh to the level of the calf.  (Id.)  Plaintiff was given 100 mg of Demerol and 50 mg of Vistaril, and reported feeling better after the treatment.  (Id.)

On August 17, 1998, Dr. Parikh gave Plaintiff an MRI of the lumbar spine.  (R. 338.)  The MRI findings revealed normal sagittal alignment and no evidence of abnormal disc signal. (Id.)  A vague 1 cm size rounded lesion of the L4 vertebrae was revealed, which had a high T1 and high T2 signal and compatible with hemangioma. (Id.)  There was no evidence of significant disc disease or osseous hypertrophic disease at L2-3 through L5-S1.  (Id.)  However, there was a relative decrease of the AP

diameter of the canal throughout the lumbar spine on the basis of somewhat short pedicles, but no evidence of root impingement or central canal stenosis. (Id.) In September of 1998, Plaintiff saw Dr. Parikh for lower back pain and hip joint pain. (R. at 373.) The doctor performed an EMG study. (Id.)

On March 8, 1999, Plaintiff visited Dr. Parikh for a neurological evaluation. (Id.) Plaintiff's wife told the doctor that Plaintiff was experiencing several syncopal episodes, all occurring when Plaintiff coughed or laughed hard. (Id.) Dr. Parikh noted that there was no history of seizure-like activity. (Id.) Plaintiff advised of a history of taking naps during the daytime, despite the efficacy of the CPAP unit. (Id.) Plaintiff explained that during the naps he had dreams, which the doctor described as hypno-gogic hallucinations (vivid dreams that a person gets in Narcolepsy). (Id.) Dr. Parikh found that, considering the clinical presentation of losing muscle tone with laughter or coughing hard, these were symptoms of cataplexy, which is commonly associated with narcolepsy. (Id.) On March 8, 1999, Dr. Parikh noted that "[f]or all practical purposes Mr. Floress is totally disabled." (Id. at 374.)

· **Dr. James R. Berg, M.D. - Treating Orthopedic Surgeon**

In July of 1998, Plaintiff began seeing Dr. Berg for treatment of degenerative joint disease. (R. at 318.) On July

11

24, 1998, the doctor's office notes indicated that Plaintiff was experiencing ongoing neurological problems with a bulging disc. (R. at 331.) He also noted that most of Plaintiff' pain was in the left hip and that the left knee was peri patellar. (Id.) Hip x-rays revealed malformed femoral heads, with bone capping, and a remodeling of the acetabulum for his dysplastic hip. However, he was reluctant to intervene surgically because of Plaintiff's large build, combined with the presence of cartilage. (Id.)

On July 28, 1998, a physical therapy evaluation indicated a diagnosis of arthritis of the left hip. (R. at 320.) Plaintiff complained of pain in both hips, with the left greater than the right, and pain in both knees. (Id.) He also reported that his legs occasionally "gave out." However, Plaintiff reported that he did not experience numbness, tingling, or pain in the lower extremities. (Id.) Plaintiff indicated that the pain increases with standing more than one hour or walking more than ten minutes, and pain decreases when lying supine. (Id.) Plaintiff was assessed with pain in hips (left greater than right) and both knees, tightness in hamstrings/quads/TFL/gastroc, weakness in both hips (left greater than right), tracking of patella superolateral, tenderness left anterior posterior hip joints and lower lumbar area. Plaintiff was prescribed aqua therapy two to three times a week for six weeks. (R. at 322.)

On August 31, 1998, Dr. Berg's review of an x-ray of
Plaintiff's hips revealed that Plaintiff had malformed femoral
heads, with bone capping. (R. at 330.) Dr. Berg decided to
consult with Dr. Jablonsky because, in his opinion, the x-rays
did not indicate that Plaintiff was a good candidate for total
hip replacement. (Id.) On September 18, 1998, Dr. Berg said
that he would see if Plaintiff was a candidate for an
arthroscopy, if not, he would have to have a non-cemented total
hip. (R. at 328.)

On October 20, 1998, Plaintiff complained to Dr. Berg of
pain primarily in the DIP joints of both hands, the right being
worse than the left. (R. at 327.) The examination revealed
that the DIP joints of both of Plaintiff's hands had a decreased
range of motion of approximately 30 degrees of flexion. (Id.) He
was neurovascularly intact and had full range of motion of the
remaining digits. (Id.)

Dr. Berg noted some nodules on both the radial and ulnar
aspect dorsally of the DIP joints of both the left and right
index fingers. (Id.) The x-ray revealed joint space narrowing
of the DIP joints of both left and right index fingers, as well
as generalized joint narrowing throughout the hands. (Id.) Some
osteophytic spurring was also noted. (Id.) Dr. Berg placed
Plaintiff on an anti-inflammatory medication and informed

Plaintiff that he was suffering from degenerative arthritis of both knees and hip. (Id.) Dr. Berg indicated in his progress notes that Plaintiff was still waiting for a consultation regarding a possible hip arthroscopy. (Id.) In addition to the anti-inflammatory medication, Dr. Berg informed Plaintiff that he might need to perform a fusion on the DIP joint for pain relief. (Id.) He also informed Plaintiff that this joint may autofuse on its own. (Id.)

· **Dr. Kenneth Margules, M.D. - Treating Rheumatologist**

Dr. Margules examined Plaintiff on February 3, 1999. (R. at 375.) His office notes indicate that Plaintiff was suffering from insomnia and sleep apnea. As a result, Plaintiff was sleeping poorly, waking up feeling exhausted, and hurting all over. (R. at 378.) Dr. Margules diagnosed obesity, fibromyalgia, bursitis of the wrists, and edema of the ankles. (R. at 379.) Progress notes through March document Plaintiff's continuing problems with edema, dizziness, fatigue, and blackouts. (R. at 381-383.) Under the heading "Problems List," Dr. Margules listed obesity, fibromyalgia, bursitis, and edema.

· **Dr. Mohammad Irshad, M.D. - Non-Examining Physical Consultative Evaluator**

On July 10, 1998, Dr. Irshad prepared a physical residual functional capacity assessment of Plaintiff at the request of the

Administration. (R. at 340-347.) He found as follows: Plaintiff suffers from degenerative joint disease of the left hip, with flexion of 100 degrees, internal rotation 10 degrees, and external rotation 45 degrees. (R. at 341-342.) Plaintiff is limited in the lower extremities with respect to pushing and/or pulling. He is also limited to occasional lifting of up to 20 pounds, frequent lifting of up to 10 pounds, standing and/or walking to two hours in an eight-hour workday, and sitting to six hours. (Id.) Further, Plaintiff has moderate limitations in climbing, balancing, stooping, kneeling, crouching, and crawling. (R. at 342.) In addition to degenerative joint disease, Plaintiff suffers from ventricular arrhythmia, reflux esophagitis, and obstructive sleep apnea syndrome. (Id.)

On November 12, 1998, Dr. Rose Angelo also prepared a physical residual functional capacity ("RFC") assessment of Plaintiff at the request of the Administration. (R. at 353-360.) Her findings were virtually identical to those of Dr. Irshad's. Dr. Angelo concluded that "Plaintiff has limitations, not disabilities," (Id.) and noted that, because Plaintiff has asthma, he should avoid concentrated exposure to extreme heat or cold, wetness, humidity, fumes, odors, dusts, gases, and poorly ventilated areas. (R. at 357.)

## B.  The ALJ's Decision

On September 17, 1999, the ALJ issued his decision, finding
that Plaintiff was disabled as of March 8, 1999 and thereafter,
but that Plaintiff had failed to establish his disability prior
to that date.  (R. at 25.)  The ALJ reviewed Plaintiff' personal
and medical history, as well as his testimony, before turning to
the medical evidence.  (R. at 18.)  The ALJ found that the
medical evidence established that Plaintiff has degenerative
joint disease of the left hip, chest pain, diabetes, renal stone,
sleep apnea, and narcolepsy.  (R. at 23.)  The ALJ stated that
these impairments significantly limit Plaintiff' ability to
perform basic work activities and, therefore, were considered
"severe" under the Act. (R. at 17, 23.)  However, the ALJ
concluded that Plaintiff does not have an impairment or a
combination of impairments sufficient to meet or equal a "listed"
impairment.  (Id.)

The ALJ found that, prior to March 8, 1999, Plaintiff
retained the residual functional capacity to perform a limited
range of sedentary work and a significant number of sedentary
jobs.  Hence, Plaintiff's allegations of disability prior to that
date were not credible.  (R. at 24.)  The ALJ concluded that,
from September 9, 1998, through March 7, 1999, Plaintiff's
impairments did not prevent work-related activities, except for

16

standing and/or walking for more than a total of 2 hours in an eight-hour workday, and lifting more than 10 pounds. (R. at 18.) The ALJ noted that, even though Plaintiff relied upon a cane, he was able to maintain good balance while ambulating and carrying weights of up to ten pounds. (Id.)

In his evaluation of the medical evidence prior to March 8, 1999, the ALJ found that documentary evidence shows that Plaintiff has a history of degenerative joint disease of the left hip, and that he was recommended for hip replacement and restricted to sedentary work activity. (Id.) With respect to Plaintiff's low back pain, an MRI of the lumbar spine without infusion revealed "no evidence of significant discogenic or osteogenic disease" to substantiate his complaints. (R. at 19.) Although Plaintiff has diabetes, there is no evidence of acidosis, hypoglycemia, or end organ damage. (Id.) Similarly, although Plaintiff has a renal stone, there is no evidence of renal dysfunction, and his treating physician opined that there are no restrictions neurologically. (Id.)

The ALJ noted that Plaintiff's chest pains are clinically thought to be non-cardiac, as the cardiologist stated there were no limitations, no ischemic heart disease, and no disabling restrictions referable to his heart. (Id.) With regard to Plaintiff's allegation of a history of sleep apnea, the ALJ

concluded that there is a lack of data regarding claimant's condition, because a January 1998 clinical finding revealed normal MRI findings of the brain, and normal EEG in both wake and sleep. (Id.) Accordingly, the ALJ concluded that objective medical evidence failed to support Plaintiff' allegations of disabling symptoms and limitations prior to March 8, 1999.

The ALJ found that, although Plaintiff was not disabled through March 7, 1999, as of March 8, 1999, the evidence demonstrated that Plaintiff was unable to sustain substantial gainful activity without unreasonable interruptions because of sleep apnea and narcolepsy. (R. 22.) Plaintiff could not do any past relevant work, and, as of March 8, 1999, his RFC included limitations that prevented him from performing jobs which exist in a significant number in the economy. (R. at 22.) Therefore, the ALJ concluded that Plaintiff was disabled as of March 8, 1999 and thereafter, but, due to lack of objective medical findings, he was not disabled prior to March 8, 1999. (R. at 25.)

## Standard of Review

In reviewing the ALJ's decision, the Court may not decide the facts, reweigh the evidence, or substitute its own judgment for that of the ALJ. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant

is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which he finds more credible). Rather, the Court must accept findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405(g), where substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron*, 19 F.3d at 333 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Sec'y of Health and Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992). This does not mean that the ALJ is entitled to unlimited judicial deference, however. The ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Herron*, 19 F.3d at 333. In addition to relying on substantial evidence, the ALJ must articulate his analysis at some minimal level. *See Young v. Sec'y of Health and Human Servs.*, 957 F.2d 386, 393 (7th Cir. 1992) (ALJ must articulate his reason for rejecting evidence "within reasonable limits" in order for meaningful appellate review). The ALJ must

build "an accurate and logical bridge" from the evidence to his conclusion. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

Finally, although Plaintiff bears the burden of demonstrating his disability, "[i]t is a basic obligation of the ALJ to develop a full and fair record." *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991) (*quoting Smith v. Sec'y of HEW*, 587 F.2d 857, 860 (7th Cir. 1978)). "Failure to fulfill this obligation is 'good cause' to remand for gathering additional evidence." *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) (finding that, if the ALJ found the evidence before him insufficient, he should have obtained more evidence.)

### Social Security Regulations

The Social Security Regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520 and 416.920 (2001). The ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers

in the national economy.  *See* 20 C.F.R. §§ 404.1520 and 416.920; *see also Young*, 957 F.2d at 389.  A finding of disability requires an affirmative answer at either step 3 or step 5.  A negative answer at any step (other than step 3) precludes a finding of disability.  *Id.*  The claimant bears the burden of proof at steps 1-4, but the burden shifts to the Commissioner at step 5.  *Id.*

The ALJ's analysis at step 5 typically involves an evaluation of the claimant's RFC to perform a particular category of work (i.e. sedentary, light, medium, heavy, or very heavy work), in combination with an application of the Medical-Vocational Guidelines ("the Grid") to determine whether an individual of the claimant's age, education, and work experience could engage in substantial gainful activity.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 2.  The Grid is a chart that classifies a claimant as disabled or not disabled, based on the claimant's physical capacity, age, education, and work experience.  *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).  If the use of the Grid is appropriate, the Commissioner or ALJ may rely upon it for determining disability, and, in such a case, the Grid alone constitutes substantial evidence sufficient to uphold the decision of the Commissioner.  *Id.*

However, where a plaintiff suffers from significant non-exertional impairments, the ALJ may not rely upon the Grid. *See* SSR 83-14. "When a plaintiff's non-exertional impairments significantly diminish his ability to work . . . the Commissioner must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which plaintiff can obtain and perform." *Bapp v. Bowen,* 802 F.2d 601, 603 (2d Cir. 1986).

Determining the onset date of a claimant's disability requires the ALJ to apply the analysis outlined in a special Social Security Ruling. SSR 83-20, 1983 WL 31249.[1] Social Security Ruling ("SSR") 83-20 provides ALJs with an analytical framework for determining a disability onset date. *Lichter v. Bowen*, 814 F.2d 430, 434 (7th Cir. 1987). Under SSR 83-20, an ALJ should consider three factors in determining an onset date: 1) the claimant's allegations; 2) the claimant's work history; and 3) medical and other evidence. *Id.; Stein v. Sullivan,* 892 F.2d 43, 46 (7th Cir. 1990)

The Ruling explains that the date a claimant alleges as an onset date should be the "starting point" of the ALJ's analysis.

---

[1] Published SSRs are binding on all components of the SSA, including ALJs. *Warmoth v. Bowen*, 798 F.2d 1109, 1111 (7th Cir. 1986). Additionally, SSR 83-20 is binding upon the Administration. *Id.*

SSR 83-20, 1983 WL 31249 at *2. Moreover, the "day the impairment caused the individual to stop work is frequently of great significance in selecting the proper onset date." *Id.* However, "the primary element in the onset determination" is medical evidence; the onset date cannot be inconsistent with the medical evidence. *Id.* Courts have acknowledged that, in the case of slowly progressing impairments, it is sometimes difficult to establish a precise onset date:

> it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.

*Nolen v. Sullivan,* 939 F.2d 516, 519 (7th Cir. 1991) (citations omitted).

Where the medical evidence is sparse or fails to indicate a precise onset date, SRR 83-20 advises ALJs to refer to a medical advisor to assist in making the necessary inferences. Lichter, 814 F.2d at 435. Finally, where the available evidence does not permit a reasonable inference, SSR 83-20 directs ALJs to obtain information from a claimant's family members, friends, and former employers "to ascertain why medical evidence is not available for the pertinent period and to furnish additional

evidence regarding the course of the individual's condition."
SSR 83-20.

## Discussion

Plaintiff contends that the ALJ erred in rejecting September 8, 1998 as the onset date for Plaintiff's disability. Specifically, Plaintiff argues that the ALJ:  1) ignored evidence favorable to Plaintiff and discussed only the evidence that supported the ALJ's conclusion; 2) improperly made an independent medical finding and failed to call upon a medical expert; 3) did not find Plaintiff disabled, even though Plaintiff is limited to sedentary work and is unable to perform tasks requiring bilateral manual dexterity; 4) erred in his Step 3 analysis by failing to specifically consider whether Plaintiff's hip impairment met the requirements of Listing 1.03A; 5) failed to make a proper credibility determination; 6) failed to meet his burden of proof at Step 5 of the sequential evaluation; and 7) violated the requirements of SSR 83-20 in his "onset" finding.

The Court finds that many of Plaintiff's arguments have merit.  The Court agrees that, in many instances, the ALJ ignored evidence that did not support his conclusion.  For example, on June 16, 1998, Dr. Narang diagnosed Plaintiff with ventricular arrhythmia, and opined that Plaintiff's "disability" resulted from arthritis in his hips and knees.  Although Dr. Narang's

24

statement, standing alone, is not conclusive evidence that
Plaintiff was disabled on June 16, 1998, the ALJ was obligated to
discuss the evidence and explain why other medical evidence was
more persuasive. *See Lauer v. Apfel*, 169 F.3d 489, 494 (7th Cir.
1999) (The ALJ may weigh and discount evidence that he finds
unpersuasive, but he may not ignore the evidence that supports
the opposite conclusion). Similarly, the ALJ should have
explained why Plaintiff's hip impairment did not meet the
requirements of Listing 1.03, despite Dr. Jablonsky's response on
the Commissioner's report form, which tended to support such a
conclusion. *See Hall ex rel. Lee v. Apfel*, 122 F. Supp.2d 959,
967 (N.D. Ill. 2000).

The Court is also persuaded that the ALJ erred by relying
upon the Grid, despite the fact that Plaintiff suffered from
significant non-exertional impairments. *See Warmoth v. Bowen,*
798 F.2d 1109, 1110-12 (7th Cir. 1986)(ruling that application of
the Grid is precluded where a plaintiff's nonexertional
impairments restrict his range of employment opportunities.)
Despite Plaintiff's nonexertional limitations, the ALJ applied
the Grid because "the claimant's additional limitations are only
slight and do not significantly erode the relevant occupational
base of jobs." (R. at 21.) The Court finds that this conclusion
is hard to justify -indeed, the ALJ does not even attempt to

justify the conclusion -- given the fact that Plaintiff required a cane to ambulate, and that he suffered from degenerative joint disease, sleep apnea, narcolepsy, and osteoarthritis.

For example, courts have ruled that use of a cane, *see Walker v. Bowen,* 826 F.2d 996, 1003 (11th Cir. 1987), and narcolepsy, *see Rosenboom v. Shalala*, 841 F. Supp. 341, 344-45 (D. Or. 1993), can be significant non-exertional impairments that preclude use of the Grid and require the ALJ to call upon a vocational expert ("VE") to determine whether there was work that Plaintiff was capable of performing. Similarly, under SSR 83-14, Plaintiff's evidence that he suffered from osteoarthritis of both hands indicates that application of the Grid is inappropriate. The ALJ's brief statement that these impairments are only "slight" does not constitute substantial evidence that these limitations were not so severe as to render application of the Grid appropriate.

Despite these serious impairments, the ALJ merely asserted, in a conclusory fashion, that they did not limit Plaintiff's basic work skills. Because the ALJ failed to articulate a logical path to support his conclusion that these impairments did not limit Plaintiff's basic work skills and that application of the Grid was appropriate, remand is warranted.

Most troubling, however, is the ALJ's failure to apply SSR 83-20, Ruling 83-20, requires ALJ's to consider 1) the claimant's allegations; 2) the claimant's work history; and 3) medical and other evidence in determining an onset date. Where the medical evidence fails to indicate a precise onset date, SSR 83-20 directs ALJs to consult a medical advisor in making this determination. Although the ALJ need not specifically reference SSR 83-20, it must be apparent that he has applied its criteria.

In this case, however, it is apparent that, instead of applying SSR 83-20, the ALJ simply relied upon the date that Dr. Parikh wrote a letter opining that Plaintiff was disabled in selecting an onset date. Although this letter is substantial evidence supporting Plaintiff's claim that he was disabled, it does not constitute substantial evidence in support of the ALJ's decision that Plaintiff was disabled as of March 8,1999, but not before.

A review of each of the elements of SSR 83-20 demonstrates that the ALJ's decision must be remanded.

### a. The ALJ Failed to Consider Plaintiff's Testimony

The ALJ's conclusion is inconsistent with Plaintiff's allegations of pain, as Plaintiff's testimony supports his allegation that he was disabled prior to March 8, 1999. As SSR 83-20 relates to Plaintiff's allegations, the ALJ rejected

Plaintiff's ongoing complaints of pain, and simply relied on Dr. Parikh's letter acknowledging that Plaintiff's condition had worsened. However, at the hearing on March 5, 1999 (three days before Dr. Parikh's letter was written), Plaintiff testified that he had experienced blackouts since early 1998 (R. at 432.) In January of 1998, Plaintiff visited Dr. Narang, complaining of fatigue, dizziness, and blackouts. (R. at 160-163.) Doctor's notes revealed continued complaints of syncopal episodes in March of 1998, September of 1998, January of 1999, and March of 1999. (R. at 384-385, 373, 374.)

During the doctor visits at which Plaintiff complained of blackouts, excessive drowsiness and sleepiness, various tests were performed to determine the origin of the problem. (Id.) Plaintiff also testified to increased frequency of episodes over the three-month period *prior* to the hearing in March; Plaintiff claimed that he suffered 32 blackout episodes in the month prior to the hearing. (R. at 433.)

It is apparent that Plaintiff's condition progressed from the time that he first reported it to his physician, in January 1998, until the date of Dr. Parikh's letter on March 8, 1999. Although the Commissioner correctly notes that the medical documentation fails to indicate precisely when, during that time frame, Plaintiff's condition became disabling, this omission is

not fatal to Plaintiff's contention that he was disabled as of September 9, 1998. SSR 83-20 specifically contemplates the possibility of determining an onset date absent corroborating medical documentation. *Lichter,* 814 F.2d at 435 (remanding adverse benefits decision where ALJ relied heavily upon lack of corroborating medical documentation and failed to properly apply SSR 83-20.)

Under SSR 83-20, the ALJ should have consulted a medical advisor to assist in establishing an onset date if he found the medical documentation inadequate. *Id.* (SSR 83-20 requires ALJs to consult a medical advisor when the medical documentation is inadequate.) Instead of doing so, the ALJ simply relied upon the date of Dr. Parikh's letter in determining the onset date, contrary to SSR 83-20.

### b. The ALJ Failed to Consider Plaintiff's Work History

In addition to improperly rejecting Plaintiff's allegations, the ALJ failed to acknowledge the significance of Plaintiff's last day of work in the determination of a disability onset date. The day the impairment caused the individual to stop work is frequently of great significance in selecting the proper onset date, so long as it is not inconsistent with medical evidence. *Stein v. Sullivan,* 892 F.2d 43, 46 (7th Cir. 1990). The ALJ

ignored the fact that Plaintiff, who has a solid work history in the restaurant industry, quit his job of thirteen years as a restaurant manager to take a lower paying, yet less physically demanding job, in order to support his family. The ALJ also apparently ignored the fact that, after only a few months of working as a chef at this lower paying job, Plaintiff was forced to quit working altogether, due to pain and his various physical impairments.

More importantly, concluding that the first date that Plaintiff became disabled was on the last day he worked is fully consistent with the medical evidence, which indicates a progressive, disabling condition. Contrary to SSR 83-20, the ALJ dismissed the September 9, 1998 onset date offered by Plaintiff, even though it was Plaintiff's last day of work and the date was consistent with medical evidence.

### c. The ALJ Failed to Properly Consider Medical Evidence

Finally, the ALJ's conclusion is inconsistent with medical records. While the ALJ is not required to address every piece of evidence, he must articulate some legitimate reason for his decision. *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000). In this case, the ALJ did not discuss why an onset date of September 8, 1998 was inconsistent with the medical evidence. The ALJ's determination that Plaintiff was not disabled until the

date Dr. Parikh wrote his letter referring to Plaintiff as disabled is supported by neither SSR 83-20 nor logic.

The Record consists of a compilation of medical evidence indicating that Plaintiff had complained for months about the exact symptoms that were referred to and provided the basis for a disability finding in Dr. Parikh's letter. Plaintiff first complained about these blackouts in January, 1998. By March of that same year, Dr. Narang prescribed a heart monitor for Plaintiff after he experienced more fainting spells, and Plaintiff participated in an arrhythmia surveillance and transtelephonic monitoring program. (R. at 134.)

In June of 1998, Dr. Narang noted that Plaintiff's syncopal episodes were non-cardiac in nature, but was still uncertain as to the cause of these episodes. (R. at 238.) Similarly, Dr. Parikh's letter specifically states that Plaintiff was complaining about syncopal episodes in September 1998, and explains that Plaintiff had visited his offices "in the past for excessive drowsiness and sleepiness." (R. at 374.)

These findings are particularly significant, because they highlight the ongoing search for a cause to the Plaintiff's long complained of symptoms. Although it was not until Dr. Parikh's March 8, 1999 evaluation that Plaintiff's disorder was classified as narcolepsy, it is clear from the record that these symptoms

existed well in advance of that diagnosis. In accepting the March 8, 1999, date as the onset date, the ALJ ignored not only the full reading of Dr. Parikh's letter, but also a trail of medical evidence related to complaints of the "blackouts" mentioned in Dr. Parikh's letter, dating back over a year.

Clearly, Plaintiff's disability did not happen overnight. The ALJ's decision ignored over one year of medical evidence indicating the same symptoms, and focused on the March 8, 1999 date. Such a conclusion is arbitrary and illogical. By failing to take into consideration the medical evidence in drawing inferences as to the disability onset date, the ALJ failed to follow the requirements of SSR 83-20.[2]

## CONCLUSION

Having carefully reviewed the entire record, the Court finds that the ALJ's failure to apply SSR 83-20 requires that the Court remand this case to the Commissioner for a determination

---

[2] To the extent the ALJ found the medical documentation too imprecise to determine an exact onset date, he should have consulted a medical advisor. Ruling 83-20 directs ALJs to consult a medical advisor when the medical documentation is inadequate to establish a precise onset date. *Bailey v. Charter*, 68 F.3d 75, 79 (4th Cir. 1995) (in the absence of clear evidence documenting the progression of Plaintiff's condition, the ALJ did not have the discretion to forego consultation with a medical advisor). The requirement that a medical advisor be consulted prior to inferring an onset date is merely a variation on the most pervasive theme in administrative law – that substantial evidence supports an agency's decision. *Id.* at 79-80.

consistent with this Opinion. The Commissioner's conclusion that Plaintiff was not disabled before March 8, 1999, is not supported by substantial evidence in the record as a whole.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment be, and the same hereby is, GRANTED.


DATED: January 16, 2002      E N T E R:

ARLANDER KEYS
United States Magistrate Judge

# United States District Court
## Northern District of Illinois
### Eastern Division

Patrick Floress

**JUDGMENT IN A CIVIL CASE**

v.

Case Number: 00 C 6496

Massanari

☐     Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■     Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that   Plaintiff's motion for summary judgment is granted.

Michael W. Dobbins, Clerk of Court

Date: 1/16/2002

Alicia Castillo, Deputy Clerk